1
2
3
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25
26
27
28

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

# SAN FRANCISCO DIVISION

JOSE ANTONIO AGUILAR
JARAMILLO,

            Plaintiff,

        v.

CITY OF SAN MATEO, AMANDA FIORE,
ANTONIO MONTOJO, MICHAEL
LEISHMAN,

            Defendants.

Case No. 13-cv-00441 NC

**ORDER DENYING IN PART AND
GRANTING IN PART
DEFENDANTS' MOTION FOR
SUMMARY JUDGMENT**

Re: Dkt. No. 59

     Plaintiff Jose Antonio Aguilar Jaramillo alleges that three San Mateo police officers assaulted him while he was on his way to a taqueria. He contends the officers struck him in the head, threw him down onto the sidewalk, and broke one of his ribs with a "knee-strike." The officers contend that they exercised reasonable force. They approached Jaramillo after they observed him in a "high-crime area" in a parked car with an expired registration. According to the officers, Jaramillo had his hand in his pocket and refused to comply with their order to remove his hand. Instead, he walked away from them. From their perspective, Jaramillo could have been hiding a weapon in his pocket. The officers argue that the force they used on Jaramillo was therefore reasonable to ensure safety. Jaramillo

was arrested for obstructing an investigation, and later released.

Jaramillo sued the officers and the City of San Mateo, alleging that the officers exercised excessive force in violation of the Fourth, Fifth, Eighth, and Fourteenth Amendments, and various state law claims. Those officers now move for summary judgment. The City also seeks summary judgment as to Jaramillo's *Monell* and state law claims.

In evaluating a summary judgment motion, "[t]he evidence of the nonmovant is to be believed, and all justifiable inferences are to be drawn in his favor." *Tolan v. Cotton*, 134 S. Ct. 1861, 1863 (2014) (quoting *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 255 (1986)). For that reason, and because genuine issues of material fact still exist, the Court DENIES in part and GRANTS in part defendants' motion for summary judgment.

## I. BACKGROUND

### A.    Facts

The following relevant facts come primarily from Jaramillo's declaration, Jaramillo's deposition testimony, the declaration of eyewitness Jason Rojas, and the deposition testimony of the three officers. *See* Dkt. Nos. 62-1 (Von Glahn Deposition); 62-2 (Montojo Deposition); 62-3 (Leishman Deposition); 62-4 (Jaramillo Deposition); 65 (Jaramillo Declaration); 66 (Rojas Declaration).

### i.    Events Leading up to Encounter Between Jaramillo and the Officers

### a.    Jaramillo's Account

According to Jaramillo, on March 13, 2012, shortly after 8:00 p.m., he drove to restaurant Las Palomas Taqueria, located on East 3rd Avenue in the City of San Mateo. Dkt. No. 23 at ¶ 6. He parked his car near the front of the restaurant, and, before exiting, turned around to reach into the backseat to search through his backpack. Dkt. No. 65 at ¶ 3. Jaramillo stated he was looking for an envelope, where he wanted to place money that he intended to hand to someone inside the restaurant. *Id.* At the time, Jaramillo carried approximately $2,800 in cash in his wallet. Dkt. No. 62-4 at 3-4.

### b.  Defendant City of San Mateo Officers' Account

On March 13, 2012, Officers Amanda Von Glahn (formerly Amanda Fiore), Antonio Montojo, and Michael Leishman of the San Mateo Police Department were patrolling the area surrounding the taqueria together in an unmarked police SUV.  Dkt. Nos. 62-1 at 5; 62-2 at 4, 7.  All of the officers were also members of the Special Investigations Bureau, a narcotics unit that investigated drug-related crimes.  Dkt. No. 62-1 at 3-4.  According to defendants, the area surrounding the restaurant—which the officers characterized as a "high-crime area"—included a smoke shop and adult bookstore; in the past, the officers claimed to have made several narcotics-related arrests in front of these businesses.  Dkt. Nos. 62-1 at 6-7, 25; 62-2 at 8; 63-3 at 19.

At approximately 8:00 p.m., the officers drove down East 3rd Avenue, and noticed Jaramillo in the driver seat of his parked vehicle looking down.  Dkt. No. 62-2 at 3, 5-6.  Montojo testified that Jaramillo's car was parked directly in front of the adult bookstore.  *Id.* at 5.  Von Glahn testified that they conducted a license plate check of Jaramillo's car by providing the plate number to police dispatch.  Dkt. No. 62-1 at 9-14.  The officers learned that the vehicle registration had expired.  *Id.*  Jaramillo later stated that the vehicle registration had indeed expired five days earlier on March 8.  Dkt. No. 65 at 2.  After learning this information, Von Glahn testified that she and Leishman exited the patrol vehicle to make contact with Jaramillo concerning the expired registration.  Dkt. No. 62-1 at 12-13.  Montojo stayed behind initially to park the police truck.  Dkt. No. 62-2 at 7.

### ii.  Encounter Between Jaramillo and Officers

### a.  Jaramillo's Account

According to Jaramillo, he got out of his car after he could not find the envelope in his backpack.  Dkt. No. 65 at ¶ 3.  He started to walk toward the rear of the car with the intention of stepping onto the sidewalk to enter the taqueria.  *Id.* at ¶ 4.  Jaramillo stated that before even getting to the sidewalk, a "woman appeared on the street dressed in street clothes, a sweatshirt."  *Id.*  He later found out this woman was Von Glahn.  *Id.*  According to Jaramillo, Von Glahn said "police officer" and "flashed something hanging from her

1   neck very quickly and then put it back insider her sweatshirt." *Id.* Jaramillo stated that it

2   looked like "some type of badge . . . ." *Id.* Von Glahn asked him if the car belonged to him

3   and Jaramillo replied yes. *Id.* Von Glahn asked him for identification. *Id.* Jaramillo stated

4   that he then tried to reach into his pocket for his wallet, but was told by Von Glahn to keep

5   his hand out of his pocket. *Id.* Jaramillo tried again to reach into his pocket for his

6   identification, but Von Glahn once more told him not to do so. *Id.* Von Glahn then

7   informed him that his registration was not valid. *Id.* Jaramillo replied that he thought it was

8   valid through March. *Id.*

9       According to Jaramillo, he doubted whether Von Glahn was a real police officer. *Id.*

10   at ¶ 5. Jaramillo explained he did not believe she or the other officers were real police

11   officers until after he was eventually handcuffed; he had heard on a Spanish news channel

12   that criminals were pretending to be police officers in order to steal from people. Dkt. No.

13   62-4 at 16, 18. Fearful for his safety, Jaramillo testified that he turned away from Von

14   Glahn and started to walk towards the restaurant. Dkt. No. 62-4 at 10. As he approached

15   the restaurant, Jaramillo stated that Von Glahn grabbed his jacket while Leishman

16   ("wearing a loose sweater") grabbed him from his right side, and Montojo (dressed in

17   "street clothes") came from his left side. Dkt. No. 65 at ¶ 6. After Montojo came from the

18   left, Jaramillo stated he "felt a blow to my left ear." *Id.* He explained that he was then

19   taken down onto the ground face down against the sidewalk. *Id.* Subsequently, Jaramillo

20   said he felt blows to his ribs from Montojo, and that Leishman was on top of his neck

21   holding him down while Von Glahn was on top of him putting his arms behind his back.

22   *Id.* at ¶ 7. Jaramillo stated that he shouted for help; he explained that he still did not believe

23   at that point that Von Glahn, Montojo, and Leishman were real police officers. *Id.* The

24   officers then placed Jaramillo in handcuffs and sat him against the wall of the taqueria. *Id.*

25   at ¶ 9.

26       Throughout the entire encounter with the officers, Jaramillo maintains that he never

27   had either of his hands in his pockets. *Id.* at ¶ 8.

28   //

### b.   Rojas' Account

Jason Rojas, a restaurant patron, was at the restaurant the night Jaramillo was arrested. Dkt. No. 66. According to Rojas, he was eating with his girlfriend at a table adjacent to Jaramillo's parking spot when he noticed a "large man" approaching Jaramillo from behind. *Id.* at 5. He claimed to have seen Jaramillo walk towards the entrance to the restaurant and observed that Jaramillo did not have his hands in his pockets. *Id.* at 6.

### c.   The Officers' Account

Upon exiting the police vehicle, Von Glahn asserts that she removed her police badge from her shirt and placed it on her chest. Dkt. No. 62-1 at 17. Von Glahn then proceeded to approach Jaramillo from the driver-side of Jaramillo's car while Leishman walked along the sidewalk on the car's passenger side. *Id.* at 17-20; Dkt. No. 62-3 at 5. According to Von Glahn and Leishman, Jaramillo stood outside of his vehicle on the street, with the driver-side, rear door open, rummaging through his backpack on the back seat. Dkt. Nos. 62-1 at 18; 62-3 at 6. Von Glahn testified that she walked up to Jaramillo, and identified herself as a police officer. Dkt. No. 62-1 at 18-19. According to Von Glahn, she showed Jaramillo her badge, asked about his expired registration, and requested to see his identification. *Id.* Von Glahn testified that Jaramillo initially answered her questions about the car, but failed to respond when asked about his identification. *Id.*

That's when Von Glahn claimed Jaramillo placed his left hand inside his left jacket pocket. *Id.* at 20. According to Von Glahn, though she asked Jaramillo to remove his hand from his pocket, he did not do so. *Id.* Von Glahn testified to noticing something "bulky" in Jaramillo's pocket. *Id.* In an attempt to identify what he was reaching for with his left hand, Von Glahn asked Jaramillo where he kept his wallet. *Id.* at 21. Again, according to Von Glahn, Jaramillo said nothing. *Id.* Unsure about what Jaramillo had in his left pocket, Von Glahn testified that she asked him to take his hand out of his pocket. *Id.*

During this time, Leishman testified that he had been standing on the sidewalk, and approached Von Glahn and Jaramillo on the street, advising them to move over to the sidewalk to avoid traffic. Dkt. Nos. 62-1 at 23-24; 62-3 at 7-8. Meanwhile, Montojo

testified that he approached Jaramillo's vehicle to join Leishman and Von Glahn. Dkt. No. 62-2 at 10. According to Leishman, he also asked Jaramillo to remove his hand from his pocket, out of concern that Jaramillo was concealing a weapon. Dkt. No. 62-3 at 7-8. Leishman acknowledged that even though Jaramillo did not take his hand out of his pocket, Jaramillo did move to the sidewalk from the street. *Id.* Leishman observed that Jaramillo initially moved at a "normal pace" and stepped onto the sidewalk, but then "turned his body" at "an angle almost as if bladed, like a bladed stance." *Id.* at 9.

According to Von Glahn, Jaramillo began to turn his left side away from her once he got on the sidewalk. Dkt. No. 62-1 at 53. This concerned her since Jaramillo's hand still remained in his front pocket and his turning his body caused her to start losing view of the pocketed hand. *Id.* Von Glahn testified that Jaramillo then started to "contort his body" and walk backwards or sideways away from her towards the restaurant. *Id.* at 26-27; Dkt. No. 62-2 at 11-12. Montojo testified that Jaramillo eventually turned around to face the direction he was walking and broke into a jog. Dkt No. 62-2 at 44. Leishman recalled that Von Glahn told Jaramillo to stop and take his hand out of his pocket. Dkt. No. 62-3 at 10.

In an attempt to slow down Jaramillo, the officers testified that Von Glahn took hold of Jaramillo's right elbow and arm. Dkt. Nos. 62-1 at 27; 62-2 at 12; 62-3 at 10. Von Glahn testified that Jaramillo "jerked his right arm away" from her, and that Montojo and Leishman quickly came to assist after she called out that Jaramillo had something in his left pocket. Dkt. No. 62-1 at 27. According to all three of the officers, Jaramillo resisted efforts by Leishman and Montojo to pull his hands out of his pockets by tensing and locking his arms. Dkt. Nos. 62-1 at 28-29; 62-2 at 13; 62-3 at 11-13.

According to Montojo, because the officers were unable to pull Jaramillo's left hand out of his pocket, they "forcibly pushed Jaramillo down to the ground on his stomach," Dkt. No. 62-2 at 13, though Von Glahn herself does not recall if she also pushed Jaramillo down or if she "kind of went down with everybody. . . ," Dkt. No. 62-1 at 29. Von Glahn testified that once Jaramillo lay on the ground, face first, she gained better control of Jaramillo's right hand and placed it behind his back. *Id.* Montojo testified that he then

applied a left knee strike to Jaramillo's left rib cage or abdomen area to get Jaramillo's left arm free. Dkt. No. 62-2 at 17, 19. According to Montojo, he was trained both in the police academy and by the police department in the "defensive tactics course" to use such a knee strike in these types of situations. Dkt. No. 62-2 at 18. Montojo explained that he applied this type of force because of the uncertainty over whether Jaramillo had a gun or knife in his pocket that he could use against the officers. *Id.* at 20.

Von Glahn and Leishman testified that once Jaramillo's left hand got free, the officers placed Jaramillo in handcuffs and arrested him for obstructing an officer investigation. Dkt. Nos. 62-1 at 29; 62-3 at 15. The officers observed that upon removal, Jaramillo's left fist was clenched but no weapons were found on him or in his jacket. Dkt. No. 62-3 at 15-16.

### iii.   Events After Alleged Excessive Force

#### a.   Jaramillo's Account

According to Jaramillo, the officers placed him in handcuffs and sat him against the wall of the restaurant. *Id.* at ¶ 9. Montojo then took off his shoes, shook them, looked at the sidewalk, and asked Jaramillo "where [he] had thrown it." *Id.* Jaramillo said he did not answer because he did not know what Montojo was referring to. *Id.* Jaramillo stated that the officers made no attempt to speak to him in Spanish that night, not even at the police station where he was later questioned. *Id.* at ¶ 10. Jaramillo said he did not understand much of what they asked him in English during the questioning. *Id.*

After his release from jail, Jaramillo said he went to the hospital for injuries sustained during the arrest, and was diagnosed with a broken rib. *Id.* at 4.

#### b.   The Officers' Account

According to Leishman, the officers sat Jaramillo up after the arrest and asked Jaramillo if he was okay. Dkt. No. 62-3 at 16. Leishman testified that he checked for any visible wounds or injuries. *Id.* According to Von Glahn, Jaramillo was then taken to the San Mateo Police Department, where she and other officers interviewed him concerning the facts and circumstances of his arrest. Dkt. No. 72 at 2.

Despite the differing accounts, the officers and Jaramillo agree that Jaramillo never

1    struck any of the police officers.  Dkt. Nos. 62-1 at 33; 67-5 at 77-78.

2        **B.    Procedural History**

3        Jaramillo sued the City of San Mateo, and Officers Von Glahn (formerly Fiore),

4    James Henley, Scott Valencia, and Art Sanchez in this Court on January 31, 2013.  Dkt. No.

5    1.  Jaramillo submitted an Amended Complaint on May 28, 2013, and changed the named

6    defendants to the City of San Mateo, and Officers Von Glahn, Sanchez, Montojo, and

7    Leishman.  Dkt. No. 23.  The Amended Complaint alleged (1) that the officers violated

8    Jaramillo's Fourth, Fifth, Eighth, and Fourteenth Amendment rights; and (2) that the City of

9    San Mateo was liable for the officers' illegal conduct.  The Complaint also brought state

10   law causes of action for (3) assault and battery; (4) intentional infliction of emotional

11   distress; (5) negligence; (6) the City's breach of duty to select train, supervise, investigate,

12   and discipline; (7) false arrest and imprisonment; (8) violations of California Civil Code

13   § 52.1; and (9) violations of California Civil Code § 51.7.  *See* Dkt. No. 23 at ¶¶ 17-59.

14       Defendants filed a series of answers and then moved for summary judgment.  Dkt.

15   Nos. 26-30, 59.  Jaramillo opposed defendants' motion.  Dkt. No. 64.  Jaramillo also

16   dismissed the claims as to Sanchez.  Dkt. No. 57.  The Court held a hearing on the summary

17   judgment motion on November 19, 2014.  Dkt. No. 74.

18       **C.    Jurisdiction**

19       This Court has jurisdiction under 28 U.S.C. §§ 1331 and 1367.  The parties consented

20   to the jurisdiction of a magistrate judge under 29 U.S.C. § 636(c).  Dkt. Nos. 4, 32.

21                    **II. LEGAL STANDARD**

22       Summary judgment may be granted only when, drawing all inferences and resolving

23   all doubts in favor of the nonmoving party, there are no genuine issues of material fact and

24   the moving party is entitled to judgment as a matter of law.  Fed. R. Civ. P. 56(c); *Tolan*,

25   134 S. Ct. at 1863; *Celotex Corp. v. Catrett*, 477 U.S. 317, 322 (1986).  A fact is material

26   when, under governing substantive law, it could affect the outcome of the case.  *Liberty*

27   *Lobby*, 477 U.S. at 248.  A dispute about a material fact is genuine if "the evidence is such

28   that a reasonable jury could return a verdict for the nonmoving party."  *Id.*  Bald assertions

Case No. 13-cv-00441 NC
SUMMARY JUDGMENT                              8

that genuine issues of material fact exist are insufficient. *Galen v. Cnty. of L.A.*, 477 F.3d 652, 658 (9th Cir. 2007).

The moving party bears the burden of identifying those portions of the pleadings, discovery, and affidavits that demonstrate the absence of a genuine issue of material fact. *Celotex*, 477 U.S. at 323. Once the moving party meets its initial burden, the nonmoving party must go beyond the pleadings, and, by its own affidavits or discovery, set forth specific facts showing that a genuine issue of fact exists for trial. Fed. R. Civ. P. 56(c); *Barthelemy v. Air Lines Pilots Ass'n*, 897 F.2d 999, 1004 (9th Cir. 1990) (citing *Steckl v. Motorola, Inc.*, 703 F.2d 392, 393 (9th Cir. 1983)). All justifiable inferences, however, must be drawn in the light most favorable to the nonmoving party. *Tolan*, 134 S. Ct. at 1863 (citing *Liberty Lobby*, 477 U.S. at 255).

## III. DISCUSSION

The issues raised in defendants' motion for summary judgment are first, whether a reasonable jury could conclude that the police officers violated Jaramillo's Fourth Amendment and other constitutional rights, and second, whether the individual officers are entitled to qualified immunity. The Court then addresses the claim over whether the City of San Mateo can be held liable for any unlawful actions of the officers. Finally, the Court turns to Jaramillo's state law claims against the officers and whether the City can be held liable under state law for the officers' actions.

### A. § 1983 Claim Against Officers (Claim 1)

Jaramillo's first claim is against Von Glahn, Montojo, and Leishman for violating his Fourth Amendment right to be free from excessive force. The officers argue that Jaramillo's claim fails because they used reasonable force and are protected by qualified immunity.

### i. Excessive Force

Title 42 U.S.C. § 1983 provides a cause of action for the deprivation of "rights, privileges, or immunities secured by the Constitution or laws of the United States" by any person acting "under color of any statute, ordinance, regulation, custom, or usage." *Gomez*

*v. Toledo*, 446 U.S. 635, 639 (1980).  But § 1983 "is not itself a source of substantive rights"; rather it provides "a method for vindicating federal rights elsewhere conferred." *Graham v. Connor*, 490 U.S. 386, 393-394 (1989).

Under the Fourth Amendment, police officers may only use "objectively reasonable" force "in light of the facts and circumstances confronting them, without regard to their underlying intent or motivation." *Id.* at 397.  To determine whether an officer's use of force was reasonable, courts must balance the "nature and quality of the intrusion on a person's liberty with the countervailing governmental interests at stake." *Davis v. City of Las Vegas*, 478 F.3d 1048, 1054 (9th Cir. 2007) (internal quotations and citations omitted).  This balancing act requires courts to "assess the quantum of force used" and then "measure the governmental interests at stake" by considering the following three factors: "(1) the severity of the crime at issue, (2) whether the suspect poses an immediate threat to the safety of the officers or others, and (3) whether he is actively resisting arrest or attempting to evade arrest by flight." *Id.* (internal quotations and citations omitted).

Of these three factors, the most important is whether the suspect posed an immediate threat to the safety of the officers or others at the time force was applied. *Graham*, 490 U.S. at 396.  The *Graham* factors, however, are not the only factors. *George v. Morris*, 736 F.3d 829, 837-38 (9th Cir. 2013).  In fact, courts must "examine the totality of the circumstances and consider 'whatever specific factors may be appropriate in a particular case, whether or not listed in *Graham*.'" *Bryan v. MacPherson*, 630 F.3d 805, 826 (9th Cir. 2010) (quoting *Franklin v. Foxworth*, 31 F.3d 873, 876 (9th Cir. 1994)).  For instance, courts may look at "the availability of less intrusive alternatives to the force employed, whether proper warnings were given[,] and whether it should have been apparent to officers that the person they used force against was emotionally disturbed." *Glenn v. Washington Cnty.*, 673 F.3d 864, 872 (9th Cir. 2011) (citations omitted).

Through this analysis, courts must judge the reasonableness of a particular use of force "from the perspective of a reasonable officer on the scene, rather than with the 20/20 vision of hindsight." *Graham*, 490 U.S. at 396 (citation omitted).  The fact remains that

"[n]ot every push or shove, even if it may later seem unnecessary in the peace of a judge's chambers, . . . violates the Fourth Amendment." *Id.* at 396-97 (internal quotation marks and citation omitted). "The calculus of reasonableness must embody allowance for the fact that police officers are often forced to make split-second judgments—in circumstances that are tense, uncertain, and rapidly evolving—about the amount of force that is necessary in a particular situation." *Id.*

Significantly, because cases involving police misconduct "nearly always requires a jury to sift through disputed factual contentions" and "almost always turn on credibility determinations," the Ninth Circuit has "held on many occasions that summary judgment or judgment as a matter of law in excessive force cases should be granted sparingly." *Drummond v. City of Anaheim*, 343 F.3d 1052, 1056 (9th Cir. 2003) (citation omitted).

Here, both Jaramillo and the officers make such "disputed factual contentions" as to what actions Jaramillo took that presented an immediate threat to the officers. On the one hand, the officers contend that Jaramillo was in a "high-crime area" and "disobeyed the officers' commands to remove his hand from his pocket," at a time when it was unclear what he had inside. Dkt. No. 60 at 19. Officer Von Glahn, the first of the officers to interact with Jaramillo, stated that she asked Jaramillo to take his hand out of his left pocket after she noticed "something bulky" inside." Dkt. No. 62-1 at 21. Similarly, Leishman said that he told Jaramillo to do the same. Dkt. No. 62-3 at 8. All three of the officers testified in deposition that Jaramillo posed a safety concern by refusing to take his left hand out of his pocket. *See* Dkt. No. 62-1 (Von Glahn) at 30 ("I was more concerned about what was in his left jacket pocket because it was more accessible"); Dkt. No. 62-2 (Montojo) at 20 ("I wasn't sure whether he had a gun or a knife in that [left] hand which could cause great bodily injury to myself or other officers on the scene."); Dkt. No. 62-3 (Leishman) at 8 ("[S]eeing hands is a very important part of our job and our officer safety.").

On the other hand, Jaramillo stated that "[a]t no point during this encounter with defendants [Von Glahn, Montojo, and Leishman] did I have either of my hands in my pockets." Dkt. No. 65 at 3. In addition, eyewitness Jason Rojas also said that "[a]s Mr.

Jaramillo walked [towards the entrance of the Las Palomas Taqueria], he did not have his hands in his pockets." Dkt. No. 66 at ¶ 6.  Given the dispute of fact between Jaramillo and the officers, and between third party Rojas and the officers, a reasonable jury may find that Jaramillo did not have his left hand in his left pocket; such a finding would negate the officers' claim that Jaramillo presented an immediate threat by concealing a weapon in his left-hand pocket.

Yet the officers emphasize that they were patrolling a "statistically high-crime area." Dkt. No. 60 at 19.  Specifically, both the inside and outside of the adult bookstore and the adjacent smoke shop were common areas where the officers claimed they had arrested people in the past for possession, or being under the influence of controlled substances. Dkt. 67-5 at 6.  But the fact that Jaramillo sat in his car with a minor traffic infraction in a "high-crime area" may not be enough for a reasonable jury to find that Jaramillo posed an immediate safety threat to the officers.  *See Loharsingh v. City & Cnty. of San Francisco*, No. 08-cv-04725 JCS, 696 F. Supp. 2d 1080, 1099 (N.D. Cal. 2010) (the fact that plaintiff sat in a parked car with his seat reclined "when combined with the high-crime neighborhood, would [not] justify finding, as a matter of law, that Defendants had reasonable suspicion that Plaintiff posed a safety threat to the officers").

Even so, the officers object to Jaramillo's statement that he never had his hands in his pockets, which comes from a declaration he signed on October 24, 2014.  According to the officers, because this recent statement from Jaramillo contradicts his prior deposition testimony and his oral interview with the officers following the arrest, this Court should not consider the most recent statement.  Dkt. No. 69 (citing *Kennedy v. Allied Mutual Ins. Co.*, 952 F.2d 262, 266 (9th Cir. 1991) ("a party cannot create an issue of fact by an affidavit contradicting his prior deposition testimony")).

This Court, however, cannot see how Jaramillo's prior statements clearly contradicts the October 24 statement.  In Jaramillo's deposition, he explained, "And when I was trying to reach for my wallet to show her [Von Glahn] the ID she said don't put your hand there . . . ." Dkt. No. 62-4 at 6; *see also id.* at 47 ("When [Officer Von Glahn] asked me to

show her ID and I was trying to look for my ID, that's when she said put your hands away from your pockets.").

Similarly, in Jaramillo's post-arrest interview with Von Glahn, the follow exchange took place:

> Von Glahn: What was in your pocket?  Why wouldn't you take your hands out of your pocket?
> Jaramillo: Uh, it was my purse inside.
> Von Glahn: Your wallet?
> Jaramillo: The wallet.
> Von Glahn: In which pocket?
> Jaramillo: This one.  (indicating)
> Von Glahn: So that's what you were holding on to?
> Jaramillo: Yeah.

Dkt. No. 71 at 6-7.

The above exchange does not support the officers' contention that "Plaintiff admit[ted] that he reached in his pocket to protect his wallet which contained nearly $3,000 in cash." Dkt. No. 69.  Jaramillo did not answer the question "Why didn't you take your hands out of your pocket?"  Instead, his answer "Uh, it was my purse inside" was in response to the question "What was in your pocket?"  Likewise, the last question referring to what Jaramillo was "holding on to" does not establish that Jaramillo actually reached into his pocket to hold onto the wallet with his hand; his answer can just as well mean that Jaramillo had his wallet on him in his pocket.

Furthermore, the Ninth Circuit in *Kennedy*—which the officers cite to in support of their objection—pointed to other circuits that urged caution when applying the general rule that an issue of fact cannot be created by an affidavit contradicting a prior statement. *Kennedy*, 952 F.2d at 266.  Indeed, the Ninth Circuit stated that "[i]n light of the jury's role in resolving questions of credibility, a district court should not reject the content of an affidavit even if it is at odds with statements made in an earlier deposition." *Id.* (quoting *Kennett-Murray Corp. v. Bone*, 622 F.2d 887, 894 (5th Cir. 1980)).  Ultimately, the *Kennedy* court held that before applying the general rule, "the district court must make a

Case No. 13-cv-00441 NC
SUMMARY JUDGMENT                      13

1  factual determination that the contradiction was actually a sham [produced merely to avoid

2  summary judgment]." *Id.* (internal quotation marks omitted).

3      Here, this Court does not see any evidence—and the moving party has not provided

4  this Court with such evidence—that Jaramillo's declaration is a "sham."

5      Even if a trier of fact concludes that Jaramillo did have his left hand in his left pocket

6  at some point, a reasonable jury may still find that no "immediate threat" existed. Courts

7  have found that a suspect's refusal to remove hands from his or her pockets, viewed along

8  with other factors such as the severity of the crime, can constitute an immediate threat to

9  officer safety in the view of a reasonable officer. *See, e.g.*, *Hodge v. City of Long Beach*,

10  425 Fed. Appx. 33, 34 (2d Cir. 2011). In *Hodge*, for instance, the court found that a

11  reasonable officer could have viewed a § 1983 plaintiff's refusal to remove his hands from

12  his pockets as increasing the threat to the officer's safety, in light of the already "volatile

13  and dangerous" scene that involved a 911 call for a domestic dispute, broken glass, and

14  plaintiff's torn and blood-stained shirt. *Id.*

15      In contrast, the severity of Jaramillo's crime does not rise to the level in *Hodge*; rather

16  Jaramillo was approached by police officers because of an expired vehicle registration.

17  Dkt. No. 62-1 at 9. Moreover, at no point did Jaramillo verbally or physically threaten the

18  officers or advance towards them; in fact, he walked away from the officers in the direction

19  of the restaurant. As Montojo himself admitted in a deposition, Jaramillo did not display

20  any violence toward any of the officers or "aggressiveness towards me." Dkt. No. 67-5 at

21  19.

22      Finally, this Court must look at the "quantum of force" or the nature of the intrusion.

23  The officers claim that the force was "minimal," and reasonable in order to secure

24  Jaramillo's compliance. Dkt. No. 60 at 18. Indeed, when asked about whether the force of

25  the impact of Jaramillo's hitting the ground after being pushed down was more or less

26  forceful than someone tripping on the sidewalk, Officer Leishman testified that the impact

27  was "[l]ess forceful . . . [b]ecause we were holding him as he was going down." *Id.*

28      But Montojo testified that Jaramillo was "forcibly pushed to the ground on his

stomach" by all three officers.  Dkt. No. 62-2 at 13.  And according to Jaramillo, once he was already "face down against the sidewalk . . . Officer Leishman was on top of my neck holding me down, and I felt blows to my ribs from Officer Montojo."  Dkt. No. 65 ¶ 7. Jaramillo also stated that "Officer Von Glahn was on top of me also putting my arms behind me [sic] back."  *Id.*  Rather than creating a dispute of fact as to the blows to Jaramillo's ribs, Montojo testified that he "kneed [Jaramillo] once with my left knee in his left rib cage or abdomen" in an attempt to get Jaramillo's left hand out of his left pocket.  Dkt. No. 62-3 at 17.  As a result, Jaramillo stated he was later diagnosed with a broken rib.  Dkt. No. 65 at ¶ 10.

In sum, a reasonable jury may look at the totality of the circumstances and conclude that the three officers who brought down Jaramillo onto the sidewalk face down, and struck him in the ribs while already on the ground, overestimated the threat Jaramillo posed, and used excessive force.  Accordingly, the officers' motion for summary judgment on Jaramillo's § 1983 claim for excessive force is DENIED.

It is worth noting that "police officers have a duty to intercede when their fellow officers violate the constitutional right of a suspect or other citizen."  *Cunningham v. Gates*, 229 F.3d 1271, 1289 (9th Cir. 2000).  "[T]he constitutional right violated by the passive defendant is analytically the same as the right violated by the person who strikes the blows."  *United States v. Koon*, 34 F.3d 1416, 1447 n.25 (9th Cir. 1994) *aff'd in part, rev'd in part*, 518 U.S. 81 (1996).  An officer who fails to intervene when his fellow officers use excessive force to effect a seizure would be responsible, like his colleagues, for violating the Fourth Amendment.  *Id.*  Officers are liable for a breach of this duty only if they had "a realistic opportunity" to intercede.  *Cunningham*, 229 F.3d at 1289.

Here, drawing all reasonable inferences in Jaramillo's favor, a reasonable jury could find that each of the officers failed to intervene when their colleagues used excessive force against Jaramillo.

//

### ii.   False Imprisonment and False Arrest

"A claim for [false] arrest is cognizable under § 1983 as a violation of the Fourth Amendment." *Dubner v. City & Cnty. of San Francisco*, 266 F.3d 959, 964 (9th Cir. 2001); *accord Lacey v. Arpaio*, 649 F.3d 1118, 1131 (9th Cir. 2011).  To succeed on this claim, a plaintiff must establish that the officers lacked probable cause to arrest him.  *Norse v. City of Santa Cruz*, 629 F.3d 966, 978 (9th Cir. 2010).  While probable cause is "incapable of precise definition or quantification," *Maryland v. Pringle,* 540 U.S. 366, 371 (2003), it is generally understood that "[p]robable cause to arrest exists when officers have knowledge or reasonably trustworthy information sufficient to lead a person of reasonable caution to believe that an offense has been or is being committed by the person being arrested," *United States v. Lopez,* 482 F.3d 1067, 1072 (9th Cir. 2007) (citing *Beck v. Ohio*, 379 U.S. 89, 91 (1964)); *accord Edgerly v. City and Cnty. of San Francisco*, 599 F.3d 946, 953 (9th Cir. 2010).

In determining whether probable cause exists to support an arrest, courts must examine "the totality of the circumstances known to the arresting officers" at the time of the arrest.  *John v. City of El Monte*, 515 F.3d 936, 940 (9th Cir. 2008).  "Because many situations which confront officers in the course of executing their duties are more or less ambiguous, room must be allowed for some mistakes on their part." *McSherry v. City of Long Beach*, 584 F.3d 1129, 1135 (9th Cir. 2009) (internal quotation marks and citations omitted).

Here, Jaramillo was arrested on charges of violating California Penal Code § 148, Resisting, Delaying, or Obstructing an Officer.  Dkt. No. 60 at 21.  If probable cause to arrest Jaramillo under this state statute existed at the time of Jaramillo's arrest, Jaramillo suffered no constitutional violation.  *See Michigan v. DeFillippo*, 443 U.S. 31, 36 (1979).

### a.   California Penal Code § 148, Resisting Arrest

California Penal Code § 148(a)(1) prohibits a person from "willfully resist[ing], delay[ing], or obstruct[ing] any . . . peace officer . . . in the discharge or attempt to discharge any duty of his or her office or employment."  The legal elements of a violation

of § 148(a) are "(1) the defendant willfully resisted, delayed, or obstructed a peace officer, (2) when the officer was engaged in the performance of his or her duties, and (3) the defendant knew or reasonably should have known that the other person was a peace officer engaged in the performance of his or her duties." *In re Muhammed C.*, 95 Cal. App. 4th 1325, 1329 (2002).

Here, the undisputed facts demonstrate that the first two elements have been satisfied. Von Glahn learned from police dispatch that Jaramillo's vehicle registration had expired. Dkt. No. 62-1 at 9-14. She approached Jaramillo and identified herself as a "police officer," showed him her police badge, and informed Jaramillo that his registration was no longer valid. Dkt. No. 65 at ¶ 4 (Jaramillo Declaration); Dkt. No. 62-1 at 18-19 (Von Glahn Declaration). A reasonable inference can be made that Von Glahn intended to issue Jaramillo a traffic citation; in other words, she was engaged in the performance of her duties under the second element of § 148(a). By turning his body away from her and walking in a different direction, Jaramillo willfully delayed Von Glahn's ability to discharge those duties.

As to the third element, Jaramillo claims that he did not know Von Glahn was a real police officer until he was being placed into handcuffs. The standard, however, is not what Jaramillo knew, but whether he reasonably should have known that Von Glahn was a police officer engaged in the performance of her duties. Here, Jaramillo does not dispute that he heard Von Glahn announce herself as a "police officer." He also stated that Von Glahn "flashed something hanging from her neck" that appeared to be "some type of badge." Dkt. No. 65 at ¶ 4. She then proceeded to inform him about his expired vehicle registration, asked him for identification, and, taking the facts in light most favorable to Jaramillo, ordered or directed him not to put his hand in his pocket. Von Glahn's actions of identifying herself as an officer, flashing her badge, and discussing traffic violations would lead a reasonable person to conclude that she indeed was a police officer.

In short, because the Court concludes that there is no triable issue of fact over whether probable cause existed to arrest Jaramillo under § 148, summary judgment on the officers'

1    false arrest claim is GRANTED.

2              **iii.    Other Constitutional Claims**

3         The officers, as the parties seeking summary judgment, "bear[] the initial

4    responsibility of informing the district court of the basis for [their] motion, and identifying

5    those portions of the pleadings, depositions, answers to interrogatories, and admissions on

6    file, together with the affidavits, if any, which [they] believe[] demonstrate the absence of a

7    genuine issue of material fact." *Celotex*, 477 U.S. at 323 (internal quotation marks

8    omitted).

9         Here, the officers state in their summary judgment motion that Jaramillo "alleges

10   constitutional violations related to equal protection, due process of law, and cruel and

11   unusual punishment." Dkt. No. 60 at 22; *see also* Dkt. 23 at ¶ 18 (Jaramillo's Amended

12   Complaint). The officers contend that "[t]here are no facts or evidence that support these

13   allegations, and therefore they are without merit." Dkt. No. 60 at 22.

14        This conclusory statement, without identifying any supporting evidence in the record,

15   is not sufficient to meet the officers' burden of "bear[ing] the initial responsibility of

16   informing the district court of the basis for [their] motion" under *Celotex*. As a result, the

17   Court DENIES the officers' motions as to Jaramillo's § 1983 claims based on these

18   constitutional amendments.

19             **iv.    Qualified Immunity**

20        The doctrine of qualified immunity protects government officials "from liability for

21   civil damages insofar as their conduct does not violate clearly established statutory or

22   constitutional rights of which a reasonable person would have known." *Pearson v.*

23   *Callahan*, 555 U.S. 223, 231 (2009) (citing *Harlow v. Fitzgerald*, 457 U.S. 800, 818

24   (1982)). Even where the defendant moves for summary judgment on qualified immunity

25   grounds, the plaintiff bears the burden of proving that the right allegedly violated was

26   clearly established at the time of the alleged misconduct. *See LSO, Ltd. v. Stroh*, 205 F.3d

27   1146, 1157 (9th Cir. 2000).

28        Courts generally engage in a two-part analysis in determining whether qualified

immunity should apply. *Tolan*, 134 S. Ct. at 1865.  A court must first determine whether the facts, "[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right[.]" *Id.* (quoting *Saucier v. Katz*, 533 U. S. 194, 201 (2001)).  The federal right at issue in excessive force cases brought under § 1983 is the Fourth Amendment right against unreasonable seizures. *Id.*

"The second prong of the qualified-immunity analysis asks whether the right in question was 'clearly established' at the time of the violation." *Id.* at 1866 (citing *Hope v. Pelzer*, 536 U. S. 730, 739 (2002)).  State actors are "shielded from liability for civil damages if their actions did not violate clearly established statutory or constitutional rights of which a reasonable person would have known." *Id.* (citation and internal quotation marks omitted).  "[T]he salient question . . . is whether the state of the law at the time of an incident provided fair warning to the defendants that their alleged [conduct] was unconstitutional." *Id.* (internal quotation marks and citation omitted).  This inquiry must be undertaken in light of the specific context of the case, not as a broad general proposition." *Saucier*, 533 U.S. at 201.  "This is not to say that an official action is protected by qualified immunity unless the very action in question has previously been held unlawful, but it is to say that in light of the pre-existing law the unlawfulness must be apparent." *Anderson v. Creighton*, 483 U.S. 635, 640 (1987).

Here, as to the first prong of the analysis, this Court already noted that genuine issues of material fact exist as to whether the officers used objectively reasonable force against Jaramillo.

As to the second prong, this Court must view the evidence in the light most favorable to Jaramillo.  As the Supreme Court recently stated in *Tolan*, another § 1983 case involving claims of excessive force by police officers: "The witnesses on both sides come to this case with their own perceptions, recollections, and even potential biases.  It is in part for that reason that genuine disputes are generally resolved by juries in our adversarial system." *Tolan*, 134 S. Ct. at 1866 (vacating Fifth Circuit decision in § 1983 excessive force case because in "failing to credit evidence that contradicted some if its key factual conclusions,

the court improperly 'weigh[ed] the evidence' and resolved disputed issues in favor of the moving party [police officer]") (quoting *Liberty Lobby*, 477 U.S. at 249).

Here, the officers claimed to have taken down Jaramillo because of his refusal to remove his hands from his pockets.  But Jaramillo claims he never had his hands in his pockets in the first place.  Resolving this dispute of fact in Jaramillo's favor, a reasonable jury could find that the officers' choice to grab Jaramillo, strike him in the left ear, throw him down onto the sidewalk, step on his neck, get on top of him to put his arms behind his back, and knee him in the ribs with enough force to lead to a broken rib would be unjustified.

Because the law has clearly established that a police officer's use of force on a suspect who does not pose an immediate threat to his or her safety is excessive and impermissible, the Court finds that the officers are not entitled to qualified immunity.  *See, e.g., Morris v. Noe*, 672 F.3d 1185, 1196 (10th Cir. 2012) (force was excessive when officer threw down suspect who carried no weapon, made no overt threats, and did not get within reach of the officers).

This goes for all of the officers.  As explained earlier, an officer who fails to intervene when his fellow officers use excessive force to effect a seizure would be responsible, like his peers, for violating the Fourth Amendment.  *Koon*, 34 F.3d at 1447 n.25.

### B.   § 1983 Claim Against San Mateo (Claim 2)

It is well established that "a municipality cannot be held liable *solely* because it employs a tortfeasor—or, in other words, a municipality cannot be held liable under § 1983 on a *respondeat superior* theory."  *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 691 (1978).  For the City to be liable under § 1983, a municipal "policy or custom" must have caused the constitutional injury.  *Id.* at 694.  This "policy can be one of action or inaction."  *Waggy v. Spokane Cnty. Washington*, 594 F.3d 707, 713 (9th Cir. 2010) (citations omitted).

"[I]t is not enough for a § 1983 plaintiff merely to identify conduct properly attributable to the municipality," however; "[t]he plaintiff must also demonstrate that,

through its *deliberate* conduct, the municipality was the 'moving force' behind the injury alleged." *Bd. of Cnty. Comm'rs of Bryan Cnty., Okl. v. Brown*, 520 U.S. 397, 404 (1997).

Under § 1983, municipal liability may be established in any one of three ways: (1) "the plaintiff may prove that a city employee committed the alleged constitutional violation pursuant to a formal governmental policy or a longstanding practice or custom which constitutes the standard operating procedure of the local governmental entity"; (2) "the plaintiff may establish that the individual who committed the constitutional tort was an official with final policy-making authority and that the challenged action itself thus constituted an act of official governmental policy"; or (3) "the plaintiff may prove that an official with final policy-making authority ratified a subordinate's unconstitutional decision or action and the basis for it." *Gillette v. Delmore*, 979 F.2d 1342, 1346-47 (9th Cir. 1992) (citations and internal quotation marks omitted).

Here, Jaramillo alleges that the officer misconduct he described in his complaint was "the proximate result of a custom, policy, pattern or practice of deliberate indifference by [the City of San Mateo] . . . and [its] failure to institute and enforce a consistent disciplinary policy." Dkt. No. 23 at ¶ 21.  He also alleges that the damages he sustained resulted from the City's failure to discipline and hold officers accountable for misconduct, and "the failure to adequately or appropriately train officers in making detentions, arrests and/or using force . . . . *Id.* at ¶ 23.

Despite having had the opportunity to conduct discovery, Jaramillo has provided no factual support for these conclusory allegations, such as evidence pointing to the existence of an unconstitutional policy or custom, beyond a recitation of the facts underlying the single incident alleged in the complaint.  In his opposition brief, Jaramillo does state that the City "turned a blind eye to all evidence against [the officers]" and that testimony from Montojo that officers are expected to "identify persons, locations, and trends where people may use drugs" creates a policy that is "asking for misconduct and discrimination against persons . . . pre-conceived to be a criminal." Dkt. No. 64 at 17.  This particular testimony from one officer is not sufficient to raise a genuine issue of material fact.

The fact remains that an individual incident of unconstitutional action by a small group of non-policymaking employees is insufficient to establish *Monell* liability. *See McDade v. W.*, 223 F.3d 1135, 1141 (9th Cir. 2000). Jaramillo has failed to raise a genuine issue of material fact that the officers' conduct was pursuant to an unconstitutional "policy or custom" as required to hold the City liable under § 1983. *See, e.g.*, *Waggy*, 594 F.3d at 713-14 (affirming summary judgment for county where plaintiff failed to provide any evidence of county policy, practice or custom, or of inadequate training and supervision that caused the alleged constitutional injury); *McSherry v. City of Long Beach*, 584 F.3d 1129, 1147 (9th Cir. 2009) (affirming summary judgment for city in § 1983 action where plaintiff failed to tender facts of policy or custom other than officers' alleged personal misdeeds); *Justin v. City & Cnty. of San Francisco*, No. 05-cv-4812 MEJ, 2008 WL 1990819, at *6-7 (N.D. Cal. May 5, 2008) (granting summary judgment on § 1983 claim in favor of city where the only support for plaintiffs' *Monell* claim were conclusory allegations and facts showing an isolated incident).

Accordingly, the Court GRANTS the City of San Mateo's motion for summary judgment on plaintiffs' second cause of action under 42 U.S.C. § 1983.

## C.    State Law Claims

Although § 1983 provides that a municipality may be held liable for a violation of federal law by a police officer only if it has adopted an unconstitutional policy or custom, "California has rejected the *Monell* rule and instead imposes liability on public entities for state law causes of action under the doctrine of respondeat superior." *Knapps v. City of Oakland*, No. 05-cv-02935 MEJ, 647 F. Supp. 2d 1129, 1165 (N.D. Cal. 2009) (citing Cal. Gov't. Code § 815.2(a); *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1110 (2004); *Robinson v. Solano Cnty.*, 278 F.3d 1007, 1016 (9th Cir. 2002) (internal citations omitted)).

Under California law, a municipality's "immunity depends upon whether the police officers are immune." *Robinson*, 278 F.3d at 1016. Here, the state law claims arise from the allegation that the officers used excessive force; California denies immunity to police officers who use excessive force in arresting a suspect. *Mary M. v. City of Los Angeles*, 54

1
2
3
4

Cal. 3d 202, 215 (1991) ("Since the enactment of the California Tort Claims Act in 1963 (§ 810 et seq.), a governmental entity can be held vicariously liable when a police officer acting in the course and scope of employment uses excessive force or engages in assaultive conduct.").

5
6
7
8

Thus, for each of the claims listed below, whenever the motion for summary judgment against the officers is granted, the motion as to the City will be granted as well. Likewise, whenever the motion is denied as to the officers, the motion as to the City will also be denied.

9

### i.    Assault and Battery (Claim 3)

10
11
12
13
14
15
16
17
18
19

"A police officer in California may use reasonable force to make an arrest, prevent escape or overcome resistance, and need not desist in the face of resistance." *Johnson v. Bay Area Rapid Transit*, No. 09-cv-00901 MHP, 790 F. Supp. 2d 1034, 1073-1074 (N.D. Cal. 2011) (quoting *Edson v. City of Anaheim*, 63 Cal. App. 4th 1269, 1272 (1998) (citing Cal. Pen. Code§ 835a)), *rev'd on other grounds*, 724 F.3d 1159 (9th Cir. 2013).  "The standard jury instruction in police battery actions recognizes this: 'A peace officer who uses unreasonable or excessive force in making a lawful arrest or detention commits a battery upon the person being arrested or detained as to such excessive force.'"  *Id.*  In an assault and battery claim against a police officer under state law, a plaintiff must show that the officer used unreasonable force.  *Id.*

20
21
22

Here, as stated above, there are issues of material fact as to whether the officers used reasonable force against Jaramillo.  Accordingly, the motion as to the assault and battery claim against the police officers is DENIED.

23

### ii.    Intentional Infliction of Emotional Distress (Claim 4)

24
25
26
27
28

In order to establish a claim for intentional infliction of emotional distress under California law, a plaintiff must show: (1) extreme and outrageous conduct by the defendant with the intention of causing, or reckless disregard of the probability of causing, emotional distress; (2) the plaintiff's suffering severe or extreme emotional distress; and (3) actual and proximate causation of the emotional distress by the defendant's outrageous conduct . . . .

Conduct to be outrageous must be so extreme as to exceed all bounds of that usually tolerated in a civilized community." *Catsouras v. Dep't of Cal. Highway Patrol*, 181 Cal. App. 4th 856, 874-75 (2010) (quoting *Christensen v. Super. Ct.*, 54 Cal. 3d 868, 903 (1991)). "Severe emotional distress means emotional distress of such substantial . . . or enduring quality that no reasonable [person] in civilized society should be expected to endure it." *Hughes v. Pair*, 46 Cal. 4th 1035, 1051 (2009) (quoting *Potter v. Firestone Tire & Rubber Co.* 6 Cal. 4th 965, 1004 (1993)).

Here, contrary to the officers' argument, if a jury believes Jaramillo's claims about the officers' actions (i.e., purposefully kneeing Jaramillo in the ribs while on the ground even though he never had his hands in his pockets), the jury could reasonably find this to be extreme and outrageous conduct. As to whether Jaramillo suffered severe emotional distress, Jaramillo states that he was "traumatized and terrified of the police officers" as a result of the alleged force they exercised on him, and continues to be "traumatized by this incident and fearful of police." Dkt. No. 65 at 4. Indeed, Jaramillo claimed to have shouted for help during the arrest, and suffered injuries as result of the officers' actions, including a broken rib. Drawing all reasonable inferences in favor of Jaramillo, a reasonable jury could find that the trauma Jaramillo suffered is substantial, and goes beyond the vague of assertions of worry, anxiety, and concern that California courts have found insufficient to constitute severe emotional distress. *See, e.g., Hughes*, 46 Cal. 4th at 1051.

In short, a reasonable jury could conclude from this that Jaramillo suffered severe emotional distress, and that the officers' excessive force served as the actual and proximate cause. *See Miller v. Fairchild Industries, Inc.*, 797 F. 2d 727, 737 (9th Cir. 1986) (holding "fright, grief, shame, humiliation, embarrassment, anger, chagrin, disappointment, or worry" are "reactions" that satisfy California's requirement that emotional distress, for purposes of IIED claim, be "severe").

Accordingly, the Court DENIES the officers' and City's motion as to this intentional infliction of emotional distress claim.

//

### iii.    Negligence (Claim 5)

"In order to prove facts sufficient to support a finding of negligence, a plaintiff must show that the defendant had a duty to use due care, that he breached that duty, and that the breach was the proximate or legal cause of the resulting injury." *Hayes v. Cnty. of San Diego*, 57 Cal. 4th 622, 629 (2013) (citations omitted).  Peace officers have a duty to act reasonably when using force, but the reasonableness of an officer's actions must be determined in light of the totality of the circumstances. *Id.*  "Therefore, to 'prevail on the negligence claim, [Jaramillo] must show that [the officers] acted unreasonably and that the unreasonable behaviour [sic] harmed' [Jaramillo]." *Ortega v. City of Oakland*, 07-cv-02659 JCS, 2008 U.S. Dist. LEXIS 85183, at *40 (N.D. Cal. Oct. 8, 2008) (quoting *Price v. Cnty. of San Diego*, 990 F. Supp. 1230, 1245 (S.D. Cal. 1998)).

Because a reasonable jury could find that the officers' acted unreasonably in their use of force against Jaramillo, the Court DENIES the officers' and City's motion as to this negligence claim.

### iv.    Breach of Duty (Claim 6)

Jaramillo fails to specify what law or statute serves as the basis for this claim.  But as the officers and the City argue—and plaintiffs have not shown otherwise—no state statute sets forth a duty of care with respect to the supervision, training, and/or discipline of peace officers. *See Molieri v. Cnty. of Marin*, No. 10-cv-05430 MMC, 2012 U.S. Dist. LEXIS 53128, at *17 (N.D. Cal. Apr. 16, 2012) (citing Cal. Gov't Code § 815 ("Except as otherwise provided by statute . . . [a] public entity is not liable for an injury whether such injury arises out of an act or omission of the public entity or a public employee or any other person."); *Munoz v. City of Union City*, 120 Cal. App. 4th 1077, 1110-15 (2004) (reversing ruling against city for "negligence in the selection, training, retention, supervision and discipline of police officers"; finding no "statutory basis" for alleged duty of care)).

Thus, to the extent this "breach of duty" cause of action is based on asserted violations of state law, the Court GRANTS the City's and the officers' motion for summary judgment.

1

### v.    False Arrest and Imprisonment (Claim 7)

2      Courts analyze state false arrest and false imprisonment claims under the same rubric

3  as § 1983 claims based on false arrest under the Fourth Amendment.  *Hamer v. City of*

4  *Eureka*, No. 12-cv-06077 JSW, 2014 U.S. Dist. LEXIS 118890, at *16-17 (N.D. Cal. May

5  28, 2014) (citing Cal. Penal Code § 847(b)(1); *Garcia v. Cnty. of Merced*, 639 F.3d 1206,

6  1213 (9th Cir. 2011)).

7      Here, because this Court found that the officers had probable cause to arrest Jaramillo

8  as a matter of law, the Court GRANTS the officers' and the City's motion as to this state

9  law cause of action for false arrest and false imprisonment.

10

### vi.    California Civil Code § 52.1 (Claim 8)

11      Jaramillo alleges that the officers interfered with his rights under the Constitutions of

12  California and the United States by means of "threats, intimidation and coercion. . . . .  Dkt.

13  No. 23 at ¶ 51.  The Court interprets the claims as being premised on Jaramillo's alleged

14  violations of his rights under the Fourth Amendment, as discussed above.

15      California Civil Code § 52.1 provides a claim for relief "against anyone who

16  interferes, or tries to do so, by threats, intimidation, or coercion, with an individual's

17  exercise or enjoyment of rights secured by federal or state law." *Jones v. Kmart Corp.*, 17

18  Cal. 4th 329, 331 (1998).  Still, liability under this section "does not extend to all ordinary

19  tort actions because its provisions are limited to threats, intimidation, or coercion that

20  interferes with a constitutional or statutory right." *Venegas v. Cnty. of Los Angeles*, 32 Cal.

21  4th 820, 843 (2004).

22      When a claim under § 52.1 is premised on the violation of a right guaranteed by the

23  U.S. Constitution, the court must look to the elements of the constitutional claim to

24  determine whether the § 52.1 cause of action is meritorious.  *See Cameron v. Craig*, 713

25  F.3d 1012, 1022 (9th Cir. 2013) ("[Plaintiff] asserts no California right different from the

26  rights guaranteed under the Fourth Amendment, so the elements of the excessive force

27  claim under § 52.1 are the same as under § 1983.").

28      Here, the officers' summary judgment motion on the excessive force issue has been

denied; it follows that their motion for summary judgment with respect to Jaramillo's § 52.1 claim—which is premised on the same alleged conduct of unreasonable force under the Fourth Amendment—must also be DENIED as to the officers and the City.  *See Knapps*, 647 F. Supp. 2d at 1168 ("The elements of a section 52.1 excessive force claim are essentially identical to those of a § 1983 excessive force claim.") (citation omitted).

### vii.    California Civil Code § 51.7 (Claim 9)

Section 51.7 grants the "right to be free from any violence, or intimidation by threat of violence, committed" against "persons or property" based on a characteristic such as sex, race, color, religion, ancestry, national origin, disability, medical condition, marital status, or sexual orientation.  Cal Civ. Code § 51.7(b), (e).

Here, the officers argue that the actions they took against plaintiff were "based on Plaintiff's active resistance and failure to remove his hand from his pocket," and not influenced by their perception of Jaramillo's race or origin.  Dkt. No. 60 at 30.  For instance, when Jaramillo's counsel asked Von Glahn—the officer who initiated contact with Jaramillo—if she ever spoke to anyone about Jaramillo's immigration status, asked Jaramillo if he was a U.S. citizen, or contacted immigration officials, Von Glahn said "No." Dkt. No. 62-1 at 36.  Jaramillo's counsel also went through a similar line of questioning with Montojo.  Montojo also testified he did not have discussions or information about Jaramillo's immigration status.  Dkt. No. 62-2 at 22.

Because Jaramillo has not presented evidence, aside from his subjective belief that the officers were "motivated by prejudice against [Jaramillo]" because he is Hispanic, Dkt. No. 23 at ¶ 56 and Dkt. No. 64 at 19, the Court GRANTS the officers' and the City's motion as to this claim under § 51.7.  *See Gomez v. City of Fremont*, 730 F. Supp. 2d 1056, 1069 (N.D. Cal. 2010) (granting summary judgment on § 51.7 claim because the plaintiff "had only a subjective belief, and not any evidence, that [the defendants] were motived by his ethnicity").

//

1

2

3

4

5

6

7

8

9

10

11

12

13

14

15

16

17

18

19

20

21

22

23

24

25

26

27

28

### IV.  CONCLUSION

For the foregoing reasons, the Court grants in part and denies in part defendants' motion for summary judgment.  With regard to the federal claims, the Court DENIES summary judgment as to Jaramillo's § 1983 claims for excessive force under the Fourth Amendment, as well as to claims based on Jaramillo's Fifth, Eighth, and Fourteenth Amendment rights.  It finds that the officers are not entitled to qualified immunity.  But the Court GRANTS summary judgment in favor of the officers and the City as to Jaramillo's § 1983 claims for false imprisonment and false arrest.  Additionally, the Court GRANTS summary judgment in favor of the City as to Jaramillo's *Monell* claim under § 1983.

For Jaramillo's state law claims, the Court DENIES summary judgment as to his claims for assault and battery, intentional infliction of emotional distress, negligence, as well as for his excessive force claims under California Civil Code § 52.1, due to disputed facts as to the reasonableness of the force used.  The Court GRANTS summary judgment in favor of the officers and the City as to Jaramillo's claims for breach of duty, false arrest and imprisonment, and his claim under California Civil Code § 51.7.

IT IS SO ORDERED.

Date:  December 19, 2014

_____
Nathanael M. Cousins
United States Magistrate Judge